May it please the Court, the trial court's decision here is based upon a finding that the standard contract that's at issue here requires the Department of Energy to accept spent nuclear fuel at a rate that precluded additional at-reactor storage after 1998, and that an annual acceptance rate of 3,000 MTUs per year was a reasonable rate based upon that requirement. In this court's decision in Pacific Gas & Electric, which was issued in August of last year, this court rejected that approach, affirming the trial court's legal analysis in that case that there was no at-reactor storage or preclusion at-reactor storage requirement. So at the very least in this particular case, the trial court's causation analysis, which was based upon these faulty assumptions, has to be vacated, at the very least remanded to the trial court for a new causation analysis based on the In this particular case, though, I think that the record would allow the court simply to reverse the trial court's finding and make the damages award in the amount of $47 million based upon the evidence that was presented to the trial court below. The reason being that there were two arguments, two theories of causation that were presented to the trial court. One was the plaintiff's theory of a 3,000 MTU acceptance rate, and the government's acceptance rate was based upon a 1999 acceptance capacity report, the rates that were presented in that report. Those were the only two causation analyses that were presented. The plaintiff made an election not to present a specific causation analysis under any other acceptance rate theory. Accordingly, based upon the evidence that was before the trial court, the most that the court could award the damages would be $47 million, plus a little bit of the specific amounts identified in our brief. Specifically, we do recognize that in PG&E, this court identified another rate, a rate identified in the 1987 annual capacity report that the Department of Energy issued, and identified that that would be the appropriate rate to apply in those cases that were before the court at that time, which were the economic, PG&E, and smuggling cases. In this particular case, there was no evidence that the plaintiff ever understood that rate to apply to this contract, and a regular tenet of contract interpretation is a contract will be interpreted in accordance with the party's understandings before it was ever evidenced in any understanding that the 1987 rate, or the 1987 ACR provided for the acceptance. It would be appropriate not to apply that rate here. Doesn't that put us in a rather anomalous situation of each contract being subject to different assumptions when, in fact, the facts have to be all the same, at least from the standpoint of what the government was offering at different times and periods? Well, we certainly agree these are standardized contracts, and generally they would be interpreted in the same way. However, before the trial court, the government attempted on numerous occasions to have all of these separate cases consolidated, at least either for deciding this rate of acceptance issue, or for purposes of at least discovery and coordination of the cases in that way. The plaintiffs successfully objected to that, and so as a result, we have individual rate cases in every single, in separate proceedings, in separate trials, involving separate plaintiffs. In this particular case, we had in fact requested and suggested in this case that the court stay or suspend proceedings in this particular case to await guidance from this court on the rate of acceptance. The plaintiff here did not want that at all, and instead went ahead and had a trial on the rate before we had appellate guidance here. The plaintiff then made an election, not what rate it was going to go with. It chose a 3,000 rate, and based all of its causation analysis damages to the trial court, based upon that acceptance rate. However, I will say that in a post-trial reply brief after oral argument in the PG&E case, the plaintiff did identify the 1987 ACR rate based upon questions from judges here, identifying that as a possible rate. And in a post-trial reply brief, which was the only briefing that was left in this particular case after the oral arguments here, it did mention the 87 ACR rate, but during discovery and during the trial, there was no mention of that as the causation basis of this case. And as we have argued in a detailed in our brief, we disagree. Well, it's not really a theory of causation so much as it's a quantum, right? I mean, it's a source of assessing quantum. In other words, what bothers me, I guess, and let me just weigh out what troubles me about your waiver theory, is it seems to me that there are many instances in which one party will make a very aggressive, for lack of a better term, claim as to the amount of damages that it's entitled to. The other party will make a very conservative assessment of what the damage ought to be. And not infrequently, a court will decide that neither one of those measures the damages that one figures. But it ought to be somewhere in between. It seems to me that this case may have aspects of that to it. I mean, what PG&E is saying, it seems to me, is neither of the two extreme theories was the correct theory of quantum. And therefore, the argument would be, go back and try to figure out based on PG&E what the right total amount of damages. Rather than saying that by virtue of having made a claim for a large amount of damages, you get nothing more than the minimum that your opposing party has proposed. Why isn't that the right way of looking at it? Well, in this particular case, I think it's only because of the election that the plaintiff here made. And in fact, this is a theory of causation, though. I mean, the causation analysis that this court laid out in PG&E, or at least adopted or accepted the trial court's method of analyzing causation, and accepted that as an appropriate method, which is basically to identify what the costs, what activities would have occurred absent the delay if contract performance had occurred. And then to identify those costs, and then to compare them to the costs that actually did occur, and to analyze causation in that manner. Here, though, you have to insert a specific Buffalo world. The plaintiff selected a specific Buffalo world and chose to analyze that as a part of establishing causation. It made a choice. It could have elected to have presented alternative causation analyses based upon different rates. It didn't do that. It made some lip service with regard to, oh, well, causation would have been the same no matter what rate you picked. But as identified in the plaintiff's page 212, the witness who was dealing with causation analyses specifically represented that he hadn't really done an in-depth analysis of that. It was just sort of a superficial representation. The single rate that the plaintiff picked here was the absolute most aggressive one that it could pick. It wasn't the first plaintiff that did that. Well, I agree with that. But instead of presenting alternatives and providing sort of a range of causation analyses, particularly in light of the unsettled nature of the rate of exceptions to apply, the plaintiff elected to pick this one. Based upon the record that we have, the judge's causation analysis does not support images under that specific causation theory. My concern is that I can see this if you're right. And the plaintiffs face a risk of being held to a waiver. Everything between the high number and the low number, particularly if the low number has to be zero, if they waive any possible theory, then it seems to me that the jury proceeding is going to become very much more complex because the plaintiff is going to have to not only claim any possible alternative theory all the way down to the zero that it could possibly imagine, but also introduce proof in support of each of those in order on appeal not to be deemed to have waived all of them. Well, doesn't that strike you as an invitation to very, very substantially reduce the complexity of the causes? Well, I think we're finding in the cases, actually, the actual, most typically, although not necessarily in this case, the plaintiffs call on expert witnesses to identify these causation analyses. And it's really not that hard to sort of put them into pockets. Within this range of rates, this is where you'd be in this range. And in terms of the expert analyses, that's what they do. In this particular case, the plaintiff elected to just go with one. It's, you know, had they presented different ranges and identified causation based upon those ranges, we'd be in a different situation. But that's not what happened here. I do, for the record, want to make sure that we identify our disagreement with, of course, decision in PG&E and with the rate that was accepted there for the reasons that we laid out in our brief. We do not believe that that particular rate, with all due respect, is a proper acceptance rate to select. The basis of the decision appears to have been that that rate was the last one that would have allowed for full performance. You're asking us to go on bond? Not at this time or in effect. This particular case, the court hasn't even applied the 87 rate yet. So we don't really have a basis to say, hey, let's go on bond at this point because those rulings haven't been applied here and the trial court didn't apply the 87 rate. So for that reason, we're sort of in a in-between point, perhaps. As the court is aware, there are some rather unusual motions pending in the A&P and PG&E cases with regard to motions for reconsideration and to recall mandates, but those are separate proceedings, although the issues are very related. But I just wanted to make that clear for the record in this particular case, our disagreement with the particular acceptance rate. And specifically with our, as we discussed in our brief, the fact that, given the rationale there, that 87 was the last tender to have been full performance without congressional involvement. The statute itself actually required congressional authorization for the actions that would have been identified in the 87 ACR. That ACR required an MRS in 1998, a repository in 2003 to provide for full performance there. Yet Congress would have had to authorize an MRS in order for DOE to perform under that rate. There are two other issues that are identified in our appeal brief. One deals with overheads that the court awarded, with which we disagree. And the second is about forward-loading costs. Briefly, with regard to overheads, actually, I am confused. My time left is into my rebuttal time, is that correct? That's right. Go ahead, and we'll give you a full rebuttal if you want to use it. All right. I'll be very brief here, Your Honor. With regard to overheads, the trial court, even though there were internal labor costs that were awarded, which were costs that were directly charged to the projects here, the trial court, an issue that we are not appealing based on this court's decision this month, the court also awarded indirect overhead costs as an allocation to this project. We believe that this is incorrect. This is not a procurement contract. This is not a situation where this company is engaged in the business of constructing things and then is making profit and overhead based upon breaches of contract or the work that it's doing. But instead, these are costs that the plaintiff would have incurred regardless of any delay. We're not saying that overheads could never be recovered. We're just saying that there needs to be more than simply just an allocation made. Even in construction cases, the ITE formula is used. There's not an automatic overhead allocation made to projects. Instead, the company here, we're not suggesting that ITE should be a formula here, but that the company should be required to show that there is some impact from the government's delay to their overhead pools, either through, for example, there's a case called Devon that this court decided with regard to interest charges, loans that were taken. There, the company, to establish that the loans were taken because of a delay, it requires the plaintiff to show that their cost pools increased during the period of the project. Here, we advocate a similar type of system. For the reasons here and in our plaintiff's review, we ask the court to reverse the contract. Thank you, Your Honor. Thank you. May it please the Court. Progress Energy spent money to store spent nuclear fuel because the pools of the Progress Energy plants ran out of space. The central question in this case is whether the DOE had performed, under the legally controlling obligations as this court has identified with Pacific Gas, whether DOE would have taken away enough fuel to keep those pools from running out of space. The answer to that question is a mechanical, mathematical exercise, fully resolvable on the current record in this proceeding. It does not require testimony. It does not require discovery by any means. It does not require further proceedings. It is, again, resolvable on the record in this proceeding. And most importantly, it doesn't require testimony. Is that true if we use the 87 rate as required by Pacific Gas? Absolutely, Your Honor. And we attempted to show that in our brief. The margins in this case and the facts in this case do not present anything like the closed question. So the minor differences between the 87 rate that this Court has decreed at Pacific Gas versus the rate that the trial court utilized will not make the difference. The pools would not have filled up. And we walked through, and I'll be the first to admit it's tedious and absurd, but we walked through that in our brief, plant by plant, allocation by allocation, to show that. And because it's tedious and absurd doesn't mean it's a disputed factual issue. Am I right that you raised this first in your implied brief? No party ever argued for application of the 87 rate. And counsel is right. The stage of this proceeding was such that oral arguments had occurred in Pacific Gas matters. And we pointed out, which is factually true, and we pointed out in more detail in our brief in this court, it's factually true to a mathematical and mechanical certainty that application of the 87 rate would not change the result. So the answer to your question, no, we did not specifically say apply the 87 rate. As we indicated in our briefs, there's dozens of potential rates. And I think as some of the colleagues in the prior proceeding suggested, to hold a plaintiff to the burden of presenting a separate Excel spreadsheet for all the 20 potential rates that might have been out there I think is not a reasonable use of anybody's time. Why didn't that counsel you to perhaps wait until Pacific Gas came down? Well, Your Honor, two things about that. First, the court here itself, sua sponte, directed the case to go forward. Now, it is true once the court ordered that, the government continued in its efforts to stay the case. They successfully boxed these cases up for a decade, Your Honor. Mr. Lester attributes that opposition to that idea to you. Well, again, two things. Initially, Progress Energy Northwest did six full months of the stay. The trial court said, no, let's go forward. And at that point then, yes, we, Progress Energy, a petitioner in this case, went ahead and moved forward. Because candidly, again, it's been a decade plus since the deal was supposed to perform. And again, particularly in the facts of this case, as we demonstrated in our brief to this court, the precise meets and bounds of what the applicable rate was doesn't make a difference on the facts of this case. The facts of this case, the pools would have had enough room. They would not have filled up under either application of the 87 rates or the 2004 rates that were applied by the trial court. And again, the differences are minor. The 87 rates are more aggressive in the early years. And one of the things I want to be clear about is if Your Honors, with respect, disagree with me and we find ourselves back to the trial court, we do reserve and anticipate recovering more money. But Progress Energy here is looking for a judgment. It has, again, been more than a decade since the deal was supposed to start performing. And we believe the record in this case and the narrowly focused deal was a good one. And how are we at this stage? Are we making those findings? They're not findings. And if I could, the government's raised four issues. And if I could sort of take about a minute each and tick off why the government's wrong in arguing or trying to suggest. They never argued. They never said, no, we've done the math of the 87 rates and it's wrong. You do. The pools do fill up. They never say that. They sort of throw out these four issues. And if I could just sort of tick through them briefly why they're all wrong. First of all, the government says, well, wait a minute. This company is trying to use allocations from the two constituent companies, Florida Power Corp and Carolina Power and Light, that emerged to form Progress Energy. Emphatically, demonstrably not true. If you read our brief, we walk through these plants one by one. We only use the allocations attributable to the spent fuel discharges for each specific plant. What's troubling me here, though, is that you're asking us to do fact-finding. You're asking us to make these calculations. You're asking us to be a finder of fact, aren't you? I am not. And there's a difference between finding facts and what this court routinely does, and all appellate courts routinely do, is affirm a judgment if the record will support it. There's no facts. A fact issue is witness A says Y and witness B says X and the court has to resolve it. A fact issue. We have an 87 rate and a 2004 rate. They are demonstrably different. You say not different enough. They say different enough to go back. And don't we have to make a factual call? With respect, no. To resolve it. With respect, no. Because the way you resolve that is, again, with no disrespect, you resolve it with fifth grade math. You go through and you look at what's not disputed, the capacity of the pools, the discharges into the pools, how much space is there. And that's not going to change. That happened in the real world. That's real. Maybe you shouldn't have said fifth grade math because now I'm feeling subconscious because I tried to work through the math and I was having trouble. Okay. Let me ask you one. This question may not be dispositive, but I had two problems. One is I don't know the answer to it just from reading the brief. And number two, I'm not sure whether it is dispositive or not. So this technically may not be fact finding, but it involves a lot of chart reading and attempts to sort out from the material you've given us exactly what's going on. So let me just ask you one question. With respect to the chart that's on page 38 of your brief and the chart that's on 41 of your brief, if you have your brief. I do. Okay. Now, if you could compare column F on 38 with column 2, where I find the two allocations, those two columns are the same. I think I understand why they're the same, except for the three entries for 2002, 2003, 2004. Now, why are those three entries different between the two columns? The shipped column, column F. Okay. As it was presented as shipped to one of two places, either to DOE in the hypothetical world that DOE had performed, or Progress Energy here moved fuel around between its plants. It shipped fuel from the Robinson and the Harris plants. I'm sorry, the Robinson and Brunswick plants to the Harris plant. And so when you look at that shipped column, and it's reflected in the more detailed spreadsheet that we refer to behind the column where F is derived from. The shipped, it's color-coded, and again, I'll be the first to admit it's tedious. But tedious doesn't mean disputed. Okay. The shipped column. Now, tedious sometimes means likely to be messed up by a court, which is looking at it from the appellate perspective. I mean, I may not be smarter than a fifth grader, but I think that what you've said already indicates to me that the task of interpolation and interpretation of all these numbers is going to be one in which, at minimum, the risk of making an error, which a trial court would be in much better position to guard against, would be significant for us. I respectfully disagree, Your Honor. And here's the reason. Because the facts aren't close in this case. Because if you go through our descriptions and the columns here, this is not a situation where we get down to a razor-thin edge where we have one assembly, one space, two spaces. In the facts of this case, in the clarity of the record here, the undisputed record, namely the capacity of the pools, which aren't going to change, the actual real-world discharges, which aren't going to change, the shipments amongst the plants, which aren't going to change. All that happened in the real world. The only task in the simple issue, as I started off my presentation in this case, is overlaying this hypothetical world. The fuel going off to Yucca Mountain or wherever. Is there enough fuel leaving to DOE to keep the pools from filling up? Demonstrably, that's the case. And again, demonstrably, in applying the 87 rates and the 04 rates, you reach the same result. The pools don't fill up. The activities of progress energy undertook are recoverable, and the judgment ought to be affirmed on that basis. And again, it's not fact-finding. And because the government says they don't agree doesn't make it an issue of fact. Because the government, with respect, would be incumbent to come forward, we suggest, and show us how we're wrong. Tell us where the math is wrong. Tell us where the numbers don't add up. They haven't done that. They've just thrown out issues. Well, maybe the plan is improperly combining the plans, as I said a few moments ago. No, we're not. We're doing it plant by plant for the allocations. The government says, well, you're using an 87 listing of the fuel. You should have used a 2004 listing of the fuel. And this is just a ranking by age. Now, the government has reversed itself. At trial, they objected to the 2004 listing of fuel. And all we're trying to do is to take away objections. But you just can't, no offense, satisfy this piece. So we use the 87 because we objected to the 2004. Now they say, well, wait a minute, that's wrong. But most importantly, when you go through the listing, it doesn't make a difference. Because what they're complaining about is about, they call it 70 MTUs, it's really 68.4. And just with a couple of record citations, if you go to page 779.8 of the appendix, you can see where those allocations appear, the two Carolina Power and Light entries. It's 245 assemblies for Brunswick 1, 53 assemblies for Robinson 2. Go to the Brunswick 1 chart at page 45 of our brief, which refers back to the record citations. The key year here is 2002. In 2002, there are 825 open spaces. So even if DOE, as the government suggests, did not take those 245 assemblies, there would still be 580 open spaces. The full reserve is 560. There's still 20 empty spaces in that pool. And same result for Robinson 2 at page 42 of our brief. And again, the same result with all these suggestions of issues that the government has raised. In fact, they're not issues. In fact, they're resolvable, difficult and tedious as they may be, but resolvable without additional fact-finding required by this board or by the board. One final point of causation that I would like to touch briefly on the other two issues in this case. Let me just answer a quick question again about the charts. Please. The chart that's on 779, or Carolina, runs across, or this is the 2004, I believe, runs across a series of numbers that begins at 69.7 for 2011. And you seem to have plugged those into 1998, 1999 to 2007 on page 34 of the red brief. Is that correct? I apologize. I missed the first page. 779 in the appendix. That's the page you just referred to that has all the various numbers. And I believe that's the 2004. Correct. It's the listing, the ranking of the field project. Right. And you were saying that that can be directly translated on page 34 of your brief into the amount that should have been taken starting in 1998, 1999, and 2007. Yes. The 2004 listing is the listing that progress used at trial. Right. Okay. Again, the government objected. This court issued a specific gas decision that said the 87 rate applies. Now, there's an 87 listing, analogous to this, that has minor material differences. There were corrections going on. And that's the point the government pointed out in its brief. They said, well, wait a minute. Don't use the 04 listing, contrary to what they said at trial. Use the 87 listing, and that creates an issue in 2002. And what I tried to explain with the record citations I just gave is it does not create an issue in 2002 because of the margins in this case. So if you do use this 04 listing that Your Honor just referred to at 779 at all, the difference is a minor difference in 2002 that is more than covered by the very ample margins at the Brunswick and Robinson Plaintiffs. Okay. Okay. One other point on causation that I would like to address. Mr. Lester alluded to the fact that, well, this plaintiff didn't believe the 1987 rates apply. And that's absurd, and I want to be clear about that. There is not a utility in the country that based its actual real-world decisions on the 87 rates. As this court pointed out, by the end of 1987, Congress had amended the law, and everybody knew the 87 rates weren't going to be applied. It was going to be an impossibility. So the notion and suggestion, and you get a whiff of it in the government's briefs here, is that this causation analysis somehow has to get back in the minds of these utilities in 1987. And the utility would have to show that it, in fact, thought DOE was going to perform in a way that no one thought they would is not the sort of causation analysis that's required. These are not, again, with respect to Windstar cases where we're constructing a future world. These are very fact-specific, concrete-and-rebar, cancel-check cases. And, again, the central issue in these cases is would the pools have filled up if DOE performed. And we think we've demonstrated our proof they would not have in this case, and, therefore, affirmance is required under the well-settled proposition that if there's adequate, supported record, the judgment should be affirmed. The two other issues, if I could briefly. Overheads, two key points here. The government concedes the overheads in this case were properly reported and allocated at page 55 of their brief and page 840 of the appendix. Second key point, it's not disputed, the projects at issue in this case actually made use of the services covered in the overheads. So that's not an issue that might be presented in some other cases where there's an overhead pool that has some tangential relations here. The overhead pools were, in fact, utilized for the activities at issue. The very nature of overheads is you cannot establish a one-for-one charge. Otherwise, there'd be direct charges. I mean, these are, by nature, human resources, warehousing types of charges that you can't direct charge to a particular project. And with respect, we think the logic of the Sacramento decision with regard to internal labor controls here. Now, granted there are differences between internal labor and overheads, but the key point is the incrementality argument that the government makes is the same with respect to both. And for the same reasons this Court rejected the internal labor argument, it ought to reject the overhead arguments. You may not fire a particular employee. You may not be able to show that the overhead pool would have been reduced by a specific dollar amount. But in both situations, the time charged by the employee and the allocation of the cost from that overhead pool, which no one disputes are real dollars spent by the company, real cancel checks for that overhead pool, as the government concedes, are a real cost to the company. And to fully compensate them ought to be awarded. Final point, DOE loading that didn't occur. We would respectfully offer two points on that. One, they are not cost avoided. They are cost at most deferred. And the resolution of that issue is controlled by this Court's decision in the Yankee Atomic case, and in particular with respect to the one-time fee obligations at the end of that case. And this Court said in that case, the partial breach case where the party's performance obligations survive, the non-breaching party is not at this time responsible for obligations that must be performed later when they mature. That statement in the context of the one-time fee is absolutely applicable and controlling to the cost that Progress Energy is going to incur one day if and when DOE performs. And so, therefore, to deduct from the damages incurred up to the end of 2005 as DOE loading costs is not a correct application of the law and unnecessarily penalizes Progress Energy. And with that, I'm always happy to turn back to the charts if we want to, but I'm confused. It is right that the case should be affirmed on the basis of the law and the record if it is established. Where is the significance? We disagree that if, as we lay out on pages 12 through 15 of our reply brief, there are various issues that impact this causation analysis here. First, the number of MTUs for the first 10 years themselves are different. There are 22,000 MTUs in the first 10 years of acceptance in Carolina's scenario, but only 18,600 in the 87 rate. The plaintiffs, again, have merged their allocations from before the time that their companies were actually merged. They also merge the contracts. They allow then swapping of allocations between the contracts after the merger, but the contract language doesn't support that. They, again, use the 2004 allocations, which are different from those in 87, and they assume early year acceptance in each of the years that they get acceptance, even though DOE has a whole year period to deal with that. If DOE, what if DOE were to come at the end of that year? After an outage at Carolina, that could significantly impact whether they would need dry storage because of that acceptance date. And finally, as we discussed in our brief, this court in Pacific Gas and Mink Atomic found that greater-than-class C waste constitutes high-level radioactive waste, and that needs to then be added to the queue. It has never been added to the queue before, and we would also ask that if this court remands this case to the trial court directing it to apply the 87 rate from the APG&E decisions, that it also direct the court to apply, as a change in the law, the GTCC portion of that decision and to incorporate the industry's GTCC into these rates because if DOE were to accept fuel, it is required in the contract to accept SNF and HLW together, and it's based on an oldest fuel, oldest waste, first basis. We would have to add GTCC into that queue to properly identify the manner in which, or the allocations that each utility would get, not only for its SNF but also for its HLW GTCC. And further, if this is such a mechanical application, as counsel stated, we don't know why this analysis wasn't presented to the trial court originally. If it's that simple and that easy, certainly it would have been simple and easy to apply to present a range of causation analyses based on different ranges of acceptance rates, and yet the plaintiff elected not to do that. Elected instead to go solely with an analysis based on the most aggressive causation rate that he could find. Finally, we also haven't had no discovery on all of these new charts and analyses that the plaintiff did. Before, that wasn't an issue. In fact, all we got was identified on page 212 of the appendix was a representation that there had been no in-depth analysis done. So there was no in-depth discovery that we were able to take with regard to these analyses and what our defenses would be to them. In addition, the plaintiff identified that they might ask for more money on remand. We just state for the record we're not aware of any case law that would provide a party who did not cross-appeal a judgment to on remand seek additional compensation under the same arguments that were made before on a remand. With regard to buffer loading costs, the counsel stated that these are just deferral costs not avoided. We would state because of the nature of this breach, a partial breach, where damages are defined in claim periods, these are certainly avoided in this claim period, and they may certainly be avoided in total. First, we don't know what the future will hold. We don't know if, in fact, there will have to be loading of casks in the future. Maybe there will be some pill or something that will be developed that will preclude the need for the types of cask loading that we currently anticipate. So we don't know whether these are avoided, but they certainly are avoided in this claim period. If we don't account for them now, we don't know if we ever will. We have seen other plaintiffs where they have sold the reactors and signed their contracts. If we have a new plaintiff after Carolina recovers here, sells its plant, we have a new plaintiff later, if these costs are not incurred in the future, the government will have no opportunity to recover them as an avoided cost. So we would ask that, based on the rationale of Indiana and Michigan, these types of costs be dealt with in the claim periods in which they are incurred, not in terms of, well, maybe they'll be incurred sometime in the future. By dealing with the claim periods, we keep it clean, and we know what costs have been incurred and avoided, and then we move to each claim period. With regard to overheads, we would, again, rely on our brief for that and ask the court, again, to reverse the process. Thank you.